# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| **LMD RESIDENTIAL, INC.** | § | |
| | § | |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:24-cv-00025** |
| | § | |
| **SLSCO, LP, KELLY HUCK, and** | § | **JURY TRIAL DEMANDED** |
| **HUCK CONSULTING GROUP, LLC** | § | |
| | § | |
| *Defendants* | § | |

## DEFENDANTS', SLSCO, LP, KELLY HUCK AND HUCK CONSULTING GROUP, LLC, MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

Pursuant to the Galveston Division Rules of Practice 6 and Federal Rules of Civil Procedure 12(b)(6) and 9(b), Defendants SLSCO, LP ("SLS"), Kelly Huck ("Huck"), and Huck Consulting Group ("Huck Consulting") (collectively "Defendants"), file this Motion to Dismiss Plaintiff LMD Residential, Inc.'s ("LDM's or "Plaintiff's") Second Amended Complaint (the "SAC") seeking dismissal of each of Plaintiff's claims. While Defendants generally challenge Plaintiff's failure to state a claim or plead fraud and misrepresentation claims with sufficient particularity, much of this Motion arises from Plaintiff's charade – namely, masquerading as a tort and quasi-contract case what this is plainly a breach of contract dispute. On proper consideration, dismissal of each of Plaintiff's tort and quasi-contract claims is appropriate.

# TABLE OF AUTHORITIES

**Cases**

*Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768 (Tex. 2009) .................... 16

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009).............................................................. 10, 11, 18

*Atl. Richfield Co. v. Misty Prods., Inc.*, 820 S.W.2d 414
   (Tex.App.-Houston [14th Dist.] 1991, writ denied ...................................... 22

*Balfour Beatty Rail, Inc. v. Kansas City S. Ry. Co.*, 173 F. Supp. 3d 363 ....................... 24

*Beal Bank, S.S.B. v. Schleider*, 124 S.W.3d 640
   (Tex. App.—Houston [1st Dist.] 2003, pet. denied) .................................... 12

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................... 10

*Bluebonnet Sav. Bank, F.S.B. v. Grayridge Apartment Homes, Inc.*,
   907 S.W.2d 904 (Tex. App.—Houston [1st Dist.] 1995, writ denied .......................... 12

*Bowman v. CitiMortgage Inc.*, No. 3:14-CV-4036-B, 2015 WL 4867746
   (N.D. Tex. Aug. 12, 2015)................................................................ 20

*Cent. Texas Express Metalwork, LLC v. Chavez*,
   No. 2:20-CV-193, 2021 WL 3631009 (S.D. Tex. July 7, 2021) ................................... 23

*Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*,
   445 S.W.3d 716 (Tex. 2014)............................................................... 19

*Crouch v. Trinque*, 262 S.W.3d 417 (Tex. App. – Eastland 2008, no pet.) ..................... 22

*Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.*,
   960 S.W.2d 41 (Tex. 1998)............................................................... 16

*Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671 (Tex. 2000) ............................... 24, 25

*Haase v. Glazner*, 62 S.W.3d 795 (Tex. 2001) ................................................ 21

*Hart v. Bayer Corp.*, 199 F.3d 239 (5th. Cir. 2000)......................................... 11

*Interstate Contracting Corp. v. City of Dallas, Tex.*,
   407 F.3d 708 (5th Cir. 2005) ......................................................... 13, 26

*JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*,
   546 S.W.3d 648 (Tex. 2018)........................................................ 12, 13, 14, 15

*JSW Steel (USA), Inc. v. Pittsburgh Logistics Systems, Inc.*,
  No. 3:20-cv-00127; 2020 WL 13239017 (S.D. Tex. Jul. 16, 2020) ............................ 11

*Leasehold Expense Recovery, Inc. v. Mothers Work, Inc.*,
  331 F.3d 452 (5th Cir. 2003) ................................................................................. 13, 26

*Mercedes-Benz USA, LLC v. Carduco, Inc.*, 583 S.W.3d 553 (Tex. 2019) .... 12, 13, 15, 21

*Montano-Valdez v. Wells Fargo Bank*, No. CIV.A., H-13-3078,
  2014 WL 69886 (S.D. Tex. Jan. 8, 2014) ........................................................................ 6

*Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419 (Tex. 2015) ............. 12, 13, 17

*Ohio Gas, Inc. v. Mecom*, 28 S.W.3d 129 (Tex. App.—Texarkana 2000, no pet.) .......... 22

*Payne v. Wells Fargo Bank Nat'l Ass'n*, 637 Fed. App'x 833 (5th Cir. 2016) ................ 20

*Richter v. Wagner Oil Co.*, 90 S.W.3d 890 (Tex. App.—San Antonio 2002, no pet.) ..... 24

*Thigpen v. Locke*, 363 S.W.2d 247 (Tex. 1962) ............................................................... 18

*Vortt Expl. Co. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942 (Tex. 1990) ............................ 24

*Wesdem, L.L.C. v. Illinois Tool Works, Inc.*, 70 F.4th 285 (5th Cir. 2023) .... 11, 16, 17, 18

*William Marsh Rice Univ. v. Arrowhead Research Corp.*,
  No. CV 14-03496, 2016 WL 3223313 (S.D. Tex. Mar. 8, 2016) ................................. 19

*Zorrilla v. Aypco Construction II, LLC*, 469 S.W.3d 143 (Tex. 2015) ............................ 20

**Statutes and Rules**

Tex. Civ. Prac. & Rem. Code §16.004(a)(4) ................................................................... 18

Fed. R. Civ. P.12(b)(6) ............................................................................... 5, 10 11, 18

Fed. R. Civ. P. Rule 9(b) ................................................................................................ 11

# I. <u>NATURE AND STAGE OF PROCEEDING</u>

1.      Plaintiff filed this suit on January 25, 2024. Dkt. 1. Plaintiff filed its First Amended Complaint on March 5, 2024. Dkt. 9. Defendants conferred with opposing counsel on the merits of this Motion on March 19, 2024. *See* Gal. Div. R. Prac. 6. Plaintiff filed its SAC on April 12, 2024. Dkt. 16. The case is in its early stages with docket call currently set for July 11, 2025. Dkt. 13.

2.      Plaintiff asserts claims for Quantum Meruit (against SLS), Promissory Estoppel (against SLS), Fraud and Fraudulent Misrepresentation (against all Defendants), Fraudulent Inducement (against all Defendants), Conspiracy to Commit Fraud (against all Defendants), and Negligent Misrepresentation (against all Defendants).

3.      Defendants hereby seek dismissal of the SAC.

# II. <u>SUMMARY OF THE ARGUMENT</u>

4.      This case is a construction dispute generally between a design and construction manager, SLS, and its subcontractor, LMD. Each contracted through the City of New York (the "City") to demolish, reconstruct and replace homes impacted by Hurricane Sandy in October of 2012. Plaintiff also sued Defendant Kelly Huck, who was the division president at SLS during the project, and a company he eventually formed in January 2020, Huck Consulting.

5.      As an initial matter, LMD's claims aim to entirely side-step the contractual relationship between SLS and LMD which is the basis for duties owed, damages sought and dispute procedures to be followed between SLS and LMD. The City and SLS first

agreed to the overriding program contract[1] ("Program Contract") for management of reconstruction after Hurricane Sandy, and then SLS and LMD entered into Prequalified Contractor Agreements ("PCA(s)") which incorporated terms of the Program Contract, for specific residential rehabilitation, reconstruction and elevation. Plaintiff refers to these agreements in paragraphs 8 and 9 of its SAC.

6.      Defendants challenge LMD's Fraud & Fraudulent Misrepresentation, Fraudulent Inducement, Conspiracy to Commit Fraud and Negligent Misrepresentation causes of action as they fail Rule 12(b)(6) and Rule 9 heightened pleading requirements, are based upon vaguely alleged misrepresentations that, in any event, contradict the unambiguous terms of the PCAs and Program Contract and on which Plaintiff cannot establish justifiable or reasonable reliance. Additionally, LMD's Fraud & Fraudulent Misrepresentation, Fraudulent Inducement, Conspiracy to Commit Fraud and Negligent Misrepresentation allegations lack the requisite particularity to allege actionable misrepresentations by Defendants.

7.      LMD's Fraudulent Inducement claim further fails against SLS, Huck and Huck Consulting because no contract is alleged to have been formed subsequent to or on the basis of any alleged fraudulent misrepresentation.

8.      The economic loss/independent injury rule bars Plaintiff's Fraud & Fraudulent Misrepresentation and Negligent Misrepresentation claims.

---

[1] The Program Agreement is between the City of New York Department of Design and Construction Division of Public Buildings – Contract for Design, Construction and Construction Management Services (FMS No. SANDHRO) and Sullivan Land Services, Ltd.

9. LMD's claims against Huck Consulting lack any alleged representations in support thereof made after January 2020, when Huck Consulting was formed.

10. LMD's Conspiracy to Commit Fraud cause of action must be dismissed because the SAC fails to allege facts establishing existence of any co-conspirators during 2018 or 2019, the times it alleges misrepresentations were made.

11. LMD's Quantum Meruit and Promissory Estoppel claims are based on services or labor provided under the PCA and Program Contracts between LMD and SLS. Recovery under these theories are precluded by the existence of a valid and enforceable contract covering the work which forms the basis of Plaintiff's claims.

12. Finally, each of the Plaintiff's tort and quasi-contract claims are subject to exclusive dispute resolution procedures in Section 20 of the PCAs, which specifically refer to Article 29 of the Program Contract outlining dispute resolution processes: disputes "in connection with the [Program Contract]" must be resolved in accordance with Article 29.

### III. STATEMENT OF RELEVANT FACTS

13. On April 17, 2015, SLS contracted with the City of New York, to serve as the Construction Manager of a portion of the Build it Back Program of the New York City Recovery Office. This Program Contract memorialized the goal to rehabilitate homes damaged by Hurricane Sandy (the "Program"). A true and correct copy of the Program Contract as attached hereto as Ex. 1.[2]

---

[2] This Court may consider on a motion to dismiss documents that are integral to or explicitly relied upon in the complaint without converting the motion into one for summary judgment. *Montano-Valdez v. Wells Fargo Bank*, No. CIV.A. H-13-3078, 2014 WL 69886, at *1 (S.D. Tex. Jan. 8, 2014). Plaintiff specifically relies on the referenced Program Contract. Dkt. 16 at ¶¶8, 9.

14.     SLS subcontracted LMD to handle the rehabilitation, reconstruction, and elevation of homes within the Program Contract through a series of nearly identical, but home specific Prequalified Contractor Agreements ("PCAs").

15.     The PCAs  expressly incorporate the Program Contract, at Section 2, Scope of Work: "[a] copy of the Program Contract is attached to and made a part of this Agreement as Ex. 'B.'" Ex. 2 at § 2 (p.2).  A true and correct copy of a PCA is attached hereto as Ex. 2.[3]  The PCAs also state "[w]ith respect to the Work, [LMD] agrees to be bound to [SLS] in the same manner and to the same extent as [SLS] is bound to the City under the Program Contract." Ex. 2 at § 2 (p 2).

16.     The Program Contract mandates a dispute resolution process in Article 29, "Resolution of Disputes" which explicitly applies to "disputes about the scope of work delineated by the Contract, the interpretation of Contract documents, the amount to be paid for extra work or disputed work performed in connection with the Contract, the conformity of the Contractor's work to the Contract, and the acceptability and quality of the Contractor's work. . ." Ex. 1 at Art. 29(1)(b) (p. 30).

17.     The PCA incorporates Article 29: "[a]ll disputes [LMD] may have of the kind delineated in Article 29 of Program Contract shall be resolved in accordance with Article 29 of the Program Contract and the PPB Rules." Ex. 2 at § 20(v) (p.19).

18.     To date, SLS and LMD have followed the requisite dispute resolution process on the same portions of work as they claim are outstanding in this case (and the dispute is still pending before the City). SAC at Ex. C.  In addition, as pled, LMD is seeking

---

[3] Plaintiff specifically relies on the referenced contracts. Dkt. 16 at ¶9.

to recover in this case the same damages claims made in the New York dispute proceedings. *Compare* SAC at ¶¶ 16, 41, 50, *with* SAC Ex. B at p.1 ("Dispute: Change Orders for Asbestos"), p.4 (Dispute: Electrical & Plumbing), p.7 (Additional Block Walls), p.10 (Hand Demolition), p.13 (Flooring & Appliances), p.16 (Weekend Setups).

19.     LMD initially pleads the PCAs cover "all labor and materials required to complete the work" to rehabilitate, reconstruct, and elevate the homes covered under the Program Contract and PCAs. SAC at ¶9. While LMD alleges challenges arising within the Program resulted in "continuous adjustments to LMD's scope of work," it describes all of its work as "necessary for the Project." *Id.* at ¶¶11, 19.

20.     LMD alleges SLS in 2017 instructed LMD to submit what it thought was extra work as change orders. SAC at ¶13. Those instructions complied with the terms of the PCAs, as illustrated in Exhibit 2. *See* Ex. 2 at p.30. These change orders were resolved. SAC at ¶13. LMD later asserts that after it was directed to submit change orders in October of 2018 SLS then told LMD in February of 2019 that the change orders should be treated as contract amendments, rather than change orders. SAC at ¶¶16-17. Plaintiff then claims in May of 2019 SLS instructed LMD to "reconvert the contract amendments back to change orders." *Id.* at ¶ 19.

21.     LMD admits, "SLS never executed [the alleged 'contract amendments']" and that LMD continued its work on the Program, despite "ignored change orders" *Id.* at ¶¶17, 18.

22.     Plaintiff alleged the following misrepresentations in the SAC:

     a.     "SLS [gave] LMD conflicting information" on the change order process (*Id*. at ¶14);

b. Defendants gave "assurances that LMD's change orders would be approved and paid" (*Id.* at ¶15);

c. SLS "assured LMD it had preserved LMD's right to payment" (*Id.* at ¶19); and

d. Defendants gave a "promise of future contract amendments or change orders to eventually pay for that work" outside the contract. (*Id.* at ¶¶35, 41, 46, 50).

23. LMD does not allege that it was fraudulently induced into entering the PCAs with SLS or that SLS made any fraudulent and/or negligent misrepresentations when the parties entered into their agreements in May 2017. *See id.* at ¶9.

24. LMD pled it was aware that the change orders were not executed and even "ignored" prior to May 2019, when LMD claims it became "concerned with how much time had lapsed on submitting this changed work." SAC at ¶¶17, 18, 19.

25. The PCAs agreed to by LMD clearly provide for a specific Change Order process as follows in Ex. 2 at §11 (p.30):

**Section 11.  Change Orders**

(i) CM expressly reserves the right to require changes in, deviations from, additions to, and omissions from, the Work herein described, and the price shall be adjusted accordingly. In addition, should the PQL identify any dangerous or "life safety" conditions in the performance of the approved Scope of Work, the PQL is required to notify CM immediately and present a Change Order for CM consideration to remedy the "life safety" concern. If adjustments are needed, the pricing referenced in Exhibit "A" may be modified only by written Change Order executed by an authorized representative of CM. Before proceeding with any change, deviation, addition or omission, the PQL will first obtain authorization from CM, which authorization will state the amount by which the price will be adjusted, if any. PQL shall have no dealings with the Owner or its authorized representatives in regard to changes, extras or omissions in connection with the Work, but must deal only with CM.

(ii) PQL agrees and acknowledges that the Work described in Exhibit "A" shall be modified only with written Change Order signed by an authorized representative of CM. No change or deviation in the scope of Work shall entitle PQL to additional compensation unless such change or deviation is approved in advance by CM and any such additional work shall be at PQL's own risk.

(iii) Payment for Extra Work or for overruns of Unit Priced items shall be determined in accordance with the provisions of Article 28 of the Program Contract.

(iv) Payment for Extra Work associated with Job Order Contract System (JOCS) contracts will be priced through the current Xactimate Bid Book (bid book) line item unit pricing. A 15% allocation will be included for contractor overhead and a 10% allocation for contractor profit will be added to the subtotal of the bid book unit rates. After the overhead and profit have been added to the bid book unit rates, the contractor's competitively bid multiplier which resulted in the subject award or assignment will be applied to the subtotal of the bid book, overhead, and profit allocations to arrive at the change order total. This JOCS pricing

26.     Notably, as agreed to by LMD, changes to referenced pricing "may be modified only by written Change Order executed by an authorized representative of SLS". Ex.2 at §11 (p.30).  And, "[n]o change or deviation in the scope of Work shall entitle [LMD] to additional compensation unless such change or deviation is approved in advance by [SLS] and any such additional work shall be at [LMD]'s own risk." *Id*.

27.     LMD brought this case as a tort and quasi-contract action to avoid negative contractual language, which established the relationship and obligations between the parties.  Dismissal is appropriate here.

## IV. <u>STANDARDS FOR FRCP 12(b)(6) DISMISSAL</u>

28.     This Court should dismiss a suit for failure to state a claim upon which relief can be granted if the complaint does not provide fair notice of the claim and does not state factual allegations showing that the right to relief is plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

29.     "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," which requires the Plaintiff  plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the alleged misconduct." *Iqbal*, 556 U.S. at 678 (internal citations omitted). Plausibility is not probability, but rather "more than a sheer possibility that a defendant has acted unlawfully." *Id*. (internal citation omitted).

## V. <u>ARGUMENT</u>

30.     Here, even with Plaintiff's factual allegations accepted as true, Plaintiff's claims cannot survive as a matter of law and should be dismissed.

**A. <u>Plaintiff's allegations of fraud, fraudulent misrepresentation, fraudulent inducement, conspiracy to commit fraud, and negligent misrepresentation do not meet the Rule 12(b)(6) or Rule 9 standards showing justifiable reliance in the face of contract language or an actionable misrepresentation.</u>**

31.    A plaintiff's complaint must contain "factual matter" that, if accepted as true, is sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is facially plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). When a plaintiff alleges a claim of fraud, Rule 9(b) of the Federal Rules of Civil Procedure requires that the plaintiff "state with particularity the circumstances constituting [the] fraud." FED. R. CIV. P. 9(b); *Wesdem, L.L.C. v. Illinois Tool Works, Inc.*, 70 F.4th 285, 291 (5th Cir. 2023).    Generally, this requires that a complaint detail the who, what, when, and where before access to the discovery process is granted. *Hart v. Bayer Corp.*, 199 F.3d 239, 247 n.6 (5th. Cir. 2000). Here, "[t]his means a plaintiff pleading a fraud claim must 'specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent.'" *JSW Steel (USA), Inc. v. Pittsburgh Logistics Systems, Inc.*, No. 3:20-cv-00127; 2020 WL 13239017, *5 (S.D. Tex. Jul. 16, 2020). Similar to *Wesdem* and *JSW*, Plaintiff has not clearly and sufficiently alleged a facially plausible case of fraud.

### *i.    Justifiable reliance is precluded by the unambiguous terms of the contracts*

32.    LMD's Third (Fraud & Fraudulent Misrepresentation), Fourth (Fraudulent Inducement), Fifth (Conspiracy to Commit Fraud) and Sixth (Negligent Misrepresentation) causes of action are based upon vague, alleged misrepresentations contrary to the

unambiguous terms of the parties' contract and fail to establish justifiable or reasonable reliance on the same. Texas law is clear: alleged misrepresentations inconsistent with a written contract between the parties may not form the basis of recovery without supporting allegations evidencing reasonable reliance. *Beal Bank, S.S.B. v. Schleider,* 124 S.W.3d 640, 651 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). Moreover, a party to "an arms-length transaction . . . must exercise ordinary care for the protection of its own interests." *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 658 (Tex. 2018). The existence of a written contract alone makes the Plaintiff's ability to establish reasonable or justifiable reliance on a subsequent oral representation difficult. *See id.* (citing *Bluebonnet Sav. Bank, F.S.B. v. Grayridge Apartment Homes, Inc.,* 907 S.W.2d 904, 908 (Tex. App.—Houston [1st Dist.] 1995, writ denied) ("[N]egligent misrepresentation is a cause of action recognized in lieu of a breach of contract claim, not usually available where a contract was actually in force between the parties.")).

33.    Causes of action sounding in fraudulent inducement also require actual and justifiable reliance, which can be "negated as a matter of law when circumstances exist under which reliance cannot be justified." *Mercedes-Benz USA, LLC v. Carduco, Inc.*, 583 S.W.3d 553, 558 (Tex. 2019) (citing *Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 424 (Tex. 2015) ("[A] party to a written contract cannot justifiably rely on oral misrepresentations regarding the contract's unambiguous terms.")). Moreover, because a fraudulent inducement claim regarding the scope of the contract necessarily requires the existence of the contract as "an essential part of its proof", it is impossible to overlook the express and unambiguous terms of the same. *Id.* at 557.

34.     "The Court's primary concern is to enforce the parties' intent as contractually expressed, and an unambiguous contract will be enforced as written." *Interstate Contracting Corp. v. City of Dallas, Tex.*, 407 F.3d 708, 712 (5th Cir. 2005) (citing *Leasehold Expense Recovery, Inc. v. Mothers Work, Inc.*, 331 F.3d 452, 456 (5th Cir. 2003). When the terms of a contract are "susceptible to only one reasonable construction, the contract is unambiguous and will be enforced as written." *Id.* at 456. Further, the contract is not rendered ambiguous by the parties' failure to include more express language of intent, and parol evidence of the parties' intent is not permitted to create ambiguity. *Leasehold Expense Recovery, Inc. v. Mothers Work, Inc.*, 331 F.3d 452, 459 (5th Cir. 2003). Regardless, where a defendant alleges a misrepresentation contradicts the language of a contract, the Texas Supreme Court has noted that the exact same language between an alleged misrepresentation and a contractual provision is not necessary for a contradiction to exist. *JPMorgan Chase*, 546 S.W.3d at 659.

35.     LMD admits in its pleading that SLS contracted LMD to provide "all labor and materials required to complete the work" to rehabilitate, reconstruct, and elevate the homes covered under the Program Contract and PCAs. *See* SAC at ¶9. LMD further admits "[d]espite the ignored change orders, LMD continued its work." SAC at ¶18.

36.     Much like the Plaintiff in *Mercedes-Benz USA*, LMD claims it was negligently or fraudulently induced into performing work it claims was outside the scope of the PCAs, yet the express terms of the PCA conflict with the misrepresentations allegedly made by SLS and thus could not have been justifiably relied upon as a matter of law by LMD. *See Mercedes-Benz*, 583 S.W.3d at 557.

37.     The express language in the PCAs mandates the scope of work may only be modified "with written Change Order signed by an authorized representative" of SLS. Ex. 2 at §11 (p.30). Additional work performed without requisite approval "shall be at [LMD's] own risk." *Id.* Allegations that SLS either, 1) waivered between instructing LMD to submit change orders as opposed to contract amendments, or 2) gave a "promise of future contract amendments or change orders to eventually pay for that work"[4] do not save Plaintiff's complaint. Instead, these allegations ignore entirely, and indeed contradict, the express requirements in the PCAs requiring written approval before performance. *See JPMorgan Chase*, 546 S.W.3d at 659; Ex. 2 at §11 (p.30).

38.     What's more, the allegation that Defendants "preserved LMD's right to payment" but "inaction resulted in the City denying all the above change orders [under Article 42 of the Program Contract]"[5] not only contradicts the required contractual processes that outline how change orders and "extra work" are to be reviewed and that LMD takes the risk if not prior approved. The PCAs clearly bind LMD to SLS as SLS is bound to the City. Ex. 2 at §2 (p.2). That includes a requirement that LMD "invoice for work . . . strictly in accordance with Article 42 of the Program Contract." Ex. 2 at § 3(ii) (p.2). LMD agreed that "[SLS] shall have no duty to pay [LMD] except upon receipt of all required documentation in support of [LMD's] invoice which has been approved by the City. . . . Ex. 2 at § 3(iii) (p.3).[6]

---

[4]SAC at ¶ 35.
[5]SAC at ¶ 20.
[6] Further, it [was] expressly understood by [LMD] that [SLS's] obligation to pay [LMD] for approved Work under the [PCA] is dependent upon [SLS's] ability to recover same from the City under the [Program Contract]. Ex. 2 at § 3(ii) (p.2).

39. Finally, Plaintiff's allegation also fails because LMD has not pled around its own legal duty to exercise care to protect its interests. *JP Morgan Chase*, 546 S.W.3d at 659. LMD's own pleading unequivocally shows LMD had contact with the City in 2018 and 2019 (i.e. "LMD coordinat[ed] with the City", as part of the change order process in 2018 and 2019.) SAC at ¶¶ 13, 17. Thus, the notion that LMD was defrauded by SLS's statement that LMD's right to payment was "preserved" is belied by LMD's own contrary pleading and related obligation to protect its interest in asserting a fraud claim. *See JP Morgan Chase*, 546 S.W.3d at 659.

40. Through its limited allegations, LMD seeks to off-load its own obligations to comply with the Program Contract because, as alleged, it was told rights were "preserved;" a claim of reliance is implausible given the contractual agreements at play and Texas law requiring LMD to protect its interest. *JP Morgan Chase*, 546 S.W.3d at 659.

41. Stated simply, LMD's reliance on the repetitive allegations, across its claims for fraud (SAC at ¶35), fraudulent misrepresentation (SAC at ¶35), fraudulent inducement (SAC at ¶41), conspiracy to commit fraud (SAC at ¶46), and negligent misrepresentation (SAC at ¶50), all overlook *an essential and critical element*—reliance is not justified because the alleged representations are contrary to the express terms of the PCA. *See Mercedes-Benz*, 583 S.W.3d at 557.

42. As outlined herein above, the alleged misrepresentations pled by LMD involve purported statements or actions that contradict the express terms of the Program Contract and PCAs. Accordingly, LMD could not justifiably rely on the alleged misrepresentations in light of the express terms regarding the change order process and what constitutes work within or outside the scope of the contract.

### ii. Plaintiff's allegations of various misrepresentations provide no facially plausible case of fraud or misrepresentation under Rule 12(b)(6) and Rule 9.

43. LMD alleges SLS gave assurances that "LMD's change orders would be approved and paid" and "it would be paid for work performed outside of LMD's original scope of work." SAC at ¶¶35, 41, 46, 50. These allegations fall short of pleading a fraud claim. This is because a promise of future performance is only actionable if the promise was made with no intention of performing at the time it was made. *Wesdem*, 70 F.4th at 292 (citing *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009); *Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998)). Plaintiff's allegations provide no grounds for an inference that either SLS or Huck had knowledge these statements were untrue at the time they were made.

44. At best, Plaintiff has only alleged that "Defendants knew it had issues with the City and that payment *may not* happen." SAC at ¶¶ 35, 46, 50. A few sentences later Plaintiff alleges that "Mr. Huck continuously promised LMD that the change order requests *were being processed*." SAC at ¶¶ 36, 46. Not only does an allegation that payment "may not happen" not equate to intention to not perform, but an allegation that change orders are being processed demonstrates no representation was made that the change orders had been approved. Moreover, Plaintiff's allegations in the SAC are particularly problematic given that Plaintiff was well aware of the change order process to which they had agreed. *See* Ex. 2 at §11(ii) (p.30). Simply stated, allegations that SLS knew LMD "may not" be paid and that change order requests are "being processed" fail to provide a facially plausible claim that SLS or Huck knew a representation that LMD would be paid was false when made.

45.     Plaintiff's other allegations of fraudulent statements fall short as well. Plaintiff has alleged that in February of 2019, ". . . SLS assured LMD the contract amendments would get executed like before." SAC at ¶ 17.  Plaintiff says it then spent time, "coordinating with the City to convert the change orders to contract amendments . . . ." *Id.* (emphasis added).   Plaintiff then pleads, ". . . in May 2019, SLS instructed LMD to reconvert the contract amendments back to change orders." *Id.* at ¶ 19.   Properly considered, the allegation of assurances that contract amendments would be executed cannot support a fraud claim for several reasons.

46.     First, the allegation suffers the same problem described above: there is no allegation or reasonable inference to be drawn that SLS or Huck did not intend to execute contract amendments when the representation was allegedly made. *See Wesdem*, 70 F.4th at 292-93.[7]  While Plaintiff pled that SLS did not sign the amendments,[8] a "[f]ailure to perform, standing alone, is no evidence of the promissor's intent not to perform when the promise was made." *Id.*

47.     Secondly, as argued below these alleged misstatements are directly contradicted by the "extra" work processes expressly outlined in the contracts. *Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d at 424–25 ("In an arm's-length transaction the defrauded party must exercise ordinary care for the protection of his own interests.... [A] failure to exercise reasonable diligence is not excused by mere confidence in the honesty

---

[7] To the extent Plaintiff argues it was "assured" in May of 2019 that its right to payment was preserved, the reliance element is eliminated by the SAC given that Plaintiff alleges in the same paragraph that SLS told LMD to "reconvert" contract amendments to change orders due to "issues" with the City. *See* SAC at ¶19.  Judicial experience and common sense require dismissal here.

[8] SAC at ¶ 17.

and integrity of the other party.") (quoting *Thigpen v. Locke,* 363 S.W.2d 247, 251 (Tex. 1962)).  Additionally, it is simply "implausible" that Plaintiff relied to its detriment on a claimed representation allegedly made and withdrawn after two months in 2019— particularly when Plaintiff alleges it had been using the change order process and continued rendering services since September of 2017. SAC at ¶13 (change orders resolved through amendments); *Iqbal*, 556 U.S. at 678.

48.     Finally, Plaintiff pled that it became aware that SLS would not use contract amendments by May of 2019 and, as a result, the applicable statute of limitations should bar a fraud claim based on and alleged misrepresentation uncovered more than four years prior to filing suit. *See* TEX. CIV. PRAC. & REM. CODE §16.004(a)(4).[9]  Not only does Plaintiff say it was aware of the alleged falsehood, Plaintiff also pled that it worked directly with the City on making the changes, both in 2018 and 2019. *See* SAC at ¶¶13, 17.  The discovery rule cannot save Plaintiff's claim here where its own pleading conclusively disproves its applicability.

49.     The role at the 12(b)(6) stage is to determine whether there is a plausible claim alleged.  Drawing on judicial experience and common sense demonstrates there is insufficient "factual content" to allow an inference that fraud occurred here. *See Wesden*, 70 F.4th at 291.

---

[9] Plaintiff filed suit on January 25, 2024. *See* ECF Dkt. 1.

**B. The economic loss/independent injury rule bars Plaintiff's fraud and negligent misrepresentation claims.**

50.    LMD's claim for fraud and misrepresentation damages sounds in contract, not in tort. LMD cannot recover contract damages in tort because LMD has not "suffered an injury that is independent and separate from the economic losses recoverable under a breach of contract claim." *William Marsh Rice Univ. v. Arrowhead Research Corp.*, No. CV 14-03496, 2016 WL 3223313, at *9 (S.D. Tex. Mar. 8, 2016). Specifically, the economic loss rule prevents LMD from recovering what are contract damages under a fraud and negligent misrepresentation theory. *Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014); *Id.* (negligent misrepresentation).

51.    LMD seeks actual and consequential damages relating to its "continuing to perform work outside of its scope", while receiving "conflicting information on how to submit request for outside-of-scope work and/or failing to timely submit LMD's change orders." SAC at ¶ 37. Plaintiff pled additional work included, ". . . hand demolition, flooring and appliance changes, weekend set up charges, additional block walls, additional electrical and plumbing work, and asbestos related work." SAC at ¶¶ 16, 41, 50. Notably, comparing LMD's pleading with its attachments, LMD currently has *this exact list of work* in dispute under the PCA and Program Contract with the City. *See* SAC Ex. B at p.1 ("Dispute: Change Orders for Asbestos"), p.4 (Dispute: Electrical & Plumbing), p.7 (Additional Block Walls), p.10 (Hand Demolition), p.13 (Flooring & Appliances), p.16 (Weekend Setups). LMD unquestionably pleads for damages that are directly related to the PCAs and Program Contract; per the SAC exhibits, the same damages are *currently being sought* from the City of New York. *Id.*; SAC at Ex. C. And, LMD has clearly alleged

that its damages were incurred as a result of "SLS . . . failing to timely submit LMD's change orders and preserve LMD's right to payment." SAC ¶ 37 (fraud and fraudulent misrepresentation allegations), ¶ 51 (negligent misrepresentation allegations). Neither SLS's alleged obligation to submit, nor LMD's right to preservation, exist without the PCAs and Program Contract.

52.    There is no secret here: LMD pleads it is owed money in this lawsuit for work done pursuant to the PCAs and Program Contract. Under the economic loss/independent injury rule, LMD is barred from recovering for fraud or negligent misrepresentation against Defendants. *Payne v. Wells Fargo Bank Nat'l Ass'n*, 637 Fed. App'x 833, 837 (5th Cir. 2016); *see also*, *Bowman v. CitiMortgage Inc.*, No. 3:14-CV-4036-B, 2015 WL 4867746, at *4 (N.D. Tex. Aug. 12, 2015).

### C.    **Plaintiff's fraudulent inducement claim fails as to SLS, Huck and Huck Consulting as no contract was formed subsequent to any alleged fraudulent representation.**

53.    "Fraudulent inducement ... is a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof. That is, with a fraudulent inducement claim, the elements of fraud must be established as they relate to an agreement between the parties.... Although economic losses may be recoverable under either fraud or fraudulent inducement ... fraud and fraudulent inducement are [not] interchangeable with respect to the measure of damages that would be recoverable." *Zorrilla v. Aypco Construction II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015) (emphasis original). Here, there is no allegation that a representation by either SLS or Huck induced LMD to enter into their original PCAs in 2017 or that there was an agreement between LMD and SLS, Huck or Huck Consulting subsequent to the representations LMD alleges

were made.  LMD generically alleges LMD was told "it would be paid for work" it considered outside the scope of original work and that "Defendants leveraged prior conduct of having LMD perform work with the promise of future contract amendments or change orders to eventually pay for that work." SAC at ¶41.  Yet, the only specific time periods LMD pleads are June and October of 2018 and February and May of 2019. SAC at ¶¶16, 17, 19.  Indeed, LMD specifically cites the attached June 30, 2018 letter as evidence that Defendants "threatened to terminate LMD on several occasions [under its 2017 contracts]." SAC at ¶18.  Yet, there is no allegation of a contract between LMD and any Defendant arising subsequent to any misrepresentation alleged. *See generally*, SAC.

54.     Without the required existence of an agreement between LMD and Defendants after misrepresentations were allegedly made, LMD's fraudulent inducement claim fails. *See Haase v. Glazner*, 62 S.W.3d 795, 797-98 (Tex. 2001).

55.     Finally, Plaintiff pled no contract or agreement that ever existed with Huck, alleged to be an employee of SLS, or Huck Consulting, alleged to be an independent contractor of SLS. SAC at ¶10; *Mercedes-Benz*, 583 S.W.3d at 558.  Thus, Plaintiff's fraudulent inducement claim against Huck and Huck Consulting must be dismissed.

### D. Plaintiff's SAC contains no factual support for causes of action against Huck Consulting.

56.     Any claims against Huck Consulting should be dismissed as Plaintiff failed to allege any representations were made after January 2020, when Huck Consulting was formed. LMD accurately pleads that Kelly Huck was an employee of SLS and served as the Housing Division President of SLS when the contracts were entered into between LMD

and SLS in May 2017. SAC at ¶¶9, 10. LMD also provides an accurate account of Huck's transition in January 2020 when he formed Huck Consulting. SAC at ¶10.

57.     LMD fails to provide any specific facts or allegations of representations being made upon which LMD relied after May of 2019. *See generally*, SAC. The SAC also lacks entirely any allegations of any representations upon which it relied made after Huck formed Huck Consulting in January of 2020, yet brings claims against Huck Consulting for claims sounding in fraud, fraudulent inducement, fraudulent misrepresentation, and conspiracy to commit fraud. *See generally*, SAC.

58.     Accordingly, because Huck Consulting did not exist at the time the allegations of wrongdoing occurred, Plaintiff failed to plead any representations made by Huck Consulting to support the causes of action for fraud, fraudulent inducement, fraudulent misrepresentation and conspiracy to commit fraud as to Huck Consulting, and these claims should be dismissed from this suit entirely.

**E.   <u>Conspiracy claim must be dismissed without Huck Consulting, and without any allegations of representations by Kelly Huck made outside of his employment with SLS.</u>**

59.     Employees or agents of a principal acting within the course and scope of their employment or agency relationship cannot enter into a conspiracy with each other so long as they are not acting outside their capacity as an employee or agent or are not acting for a personal purpose of their own; the acts of the employees or agents are acts of the principal, and the general rule applies. *Crouch v. Trinque*, 262 S.W.3d 417, 427 (Tex. App. – Eastland 2008, no pet.) (citing *Tex.-Ohio Gas, Inc. v. Mecom,* 28 S.W.3d 129, 138 (Tex. App.— Texarkana 2000, no pet.); *Atl. Richfield Co. v. Misty Prods., Inc.,* 820 S.W.2d 414, 421

(Tex.App.-Houston [14th Dist.] 1991, writ denied)). In *Chavez*, the Court dismissed Plaintiff's civil conspiracy theory, holding:

> Plaintiff's civil conspiracy claims fail as a matter of law on the first element that requires two or more people to conspire because Plaintiff alleges facts in its Second Amended Complaint that Garren—acting "by and through its own, officers, or agents, including E. Chavez and/or R. Chavez—set into action the plan for Garren to wrongfully deny payments" to Plaintiff. (D.E. 41, p. 38). By alleging that the Chavezes were acting as agents of Garren—their principal, the concerted action that Plaintiff alleged did not occur between two or more persons as required for a civil conspiracy claim. As such, the civil conspiracy claim in the Second Amended Complaint is dismissed.

*Id.*

60.     As detailed above, Huck Consulting did not exist at the time Plaintiff's allegations of wrongdoing occurred. Further, Plaintiff failed to plead any representations made by Huck Consulting. Therefore, without Huck Consulting, Plaintiff must have alleged representations made by Kelly Huck outside of his employment with SLS to support its claim of conspiracy to commit fraud. Plaintiff did not do so. *See generally,* SAC. Thus, Huck's alleged wrongful conduct occurred while an employee of SLS, and the conspiracy claim should be dismissed because a corporation cannot conspire with itself, or its agents. *See Cent. Texas Express Metalwork, LLC v. Chavez*, No. 2:20-CV-193, 2021 WL 3631009, at *7 (S.D. Tex. July 7, 2021).

**F.  Plaintiff's causes of action for quantum meruit and promissory estoppel are precluded by the parties' contract expressly contemplating all alleged work provided.**

61.     LMD's quantum meruit and promissory estoppel causes of action are based on services or labor provided under the contractual relationship between LMD and SLS. Recovery under any of these theories are precluded by the existence of a valid and

enforceable contract covering the work which form the basis of Plaintiff's claims. *Vortt Expl. Co. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990) ("A party may recover under quantum meruit only when there is no express contract covering the services or materials furnished."); *Richter v. Wagner Oil Co.*, 90 S.W.3d 890, 899 (Tex. App.—San Antonio 2002, no pet.) ("Promissory estoppel is not applicable to a promise covered by a valid contract between the parties."). Texas law is clear, quasi-contract theories cannot supersede or exist in conjunction with a valid agreement addressing the matter. *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000).

62.     LMD fails to plead how the work it desires to classify as "extra work" arose "outside and independent of the contract." *See* SAC at ¶ 25 (citing *Balfour Beatty Rail, Inc. v. Kansas City S. Ry. Co.*, 173 F. Supp. 3d 363, 402). The nuance in *Balfour* that Plaintiff overlooks is the difference between "extra work," which constitutes work arising outside and independent of the contract and not required in its performance, and "additional work," or work that is required in the performance of the contract and without it which it performance could not be carried out. *See Balfour*, 173 F. Supp. 3d at 402. LMD admits the alleged "additional work" was "necessary for the Project" and yet still attempts to classify that very same work as "outside of its scope." SAC at ¶16. Additionally, LMD does not deny the broad scope of work it was contracted to complete, pleading the PCAs cover "all labor and materials required to complete the work" to rehabilitate, reconstruct, and elevate the homes covered under the Program Contract and PCAs. SAC at ¶9.

63.     The PCAs incorporated the Program Contract. *See* Ex. 2 at §2 (p.2) (Scope of Work: "[a] copy of the Program Contract is attached to and made a part of this Agreement as Ex. 'B.'"). The PCAs incorporated the specifications and plans and required

all work to be conducted expressly subject to the terms, conditions and requirements set forth within the PCA. *See id.*

64.     The PCAs specifically address "changes in, deviations from, additions to, and omissions from, the Work herein described." Ex. 2 at §11 (p.30), Change Orders. These changes are subsumed in the process of change orders. *See id.*

65.     Plaintiff's pled "extra work" is not outside of the scope of the parties' agreed, foreseeable work. Section 11 of the PCAs clearly account for and provides an adequate process and remedy for Plaintiff's alleged extra work. Plaintiff's quantum meruit and promissory estoppel claims are based on services or labor provided under the contractual relationship between LMD and SLS. Unlike what Plaintiff seeks to do in this lawsuit, quasi-contract theories cannot supersede or overwrite contract terms between the parties. *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000). Plaintiff's quantum meruit and promissory estoppel claims should be dismissed.

**G.     Plaintiff's case should be dismissed as Plaintiff's claims are based on obligations under contract and are governed by and subject to the exclusive dispute resolution process outlined in Section 20 of the PCAs and Article 29 of the Program Contract.**

66.     Finally, Plaintiff's claims are expressly governed by and subject to the dispute resolution process provided in Article 29 of the Program Contract and incorporated, via Section 20, of the PCAs. Plaintiff fails to plead any basis for why the claims raised in this litigation are not barred by the express terms and conditions of Article 29.

67.     The dispute resolution process outlined in the Program Contract and the PCAs is broad and undeniably applies to "disputes about the scope of work delineated" and "the amount to be paid for extra work or disputed work performed in connection with

the Contract . . . ." Ex. 1 at Art. 29 (1) (p.30).  The resolution steps include presentation of the dispute to the Commissioner, presentation of the dispute to the Comptroller, presentation of the dispute to the Contract Dispute Resolution Board ("CDRB"), and finally an appeal to a Court at law on whether the CDRB decision was made in violation of lawful procedure, error of law, or was arbitrary or capricious. *See* Ex. 1, at Art. 29 (4), (5), (7), and (7)(f) (pp.30-32).  Again, this is the procedure which LMD agreed that this dispute would be "finally resolved."

68.     Plaintiff's own conduct reflects applicability of the dispute resolution process as LMD and SLS have followed the dispute process outlined in Section 20 and Article 29 on the exact same portions of work LMD claims are outstanding in this case (and the dispute is still pending before the City). *Compare* SAC at ¶¶ 16, 41, 50, *with* SAC Ex. B at p.1 ("Dispute: Change Orders for Asbestos"), p.4 (Dispute: Electrical & Plumbing), p.7 (Additional Block Walls), p.10 (Hand Demolition), p.13 (Flooring & Appliances), p.16 (Weekend Setups); SAC at Ex. C.

69.     "The Court's primary concern is to enforce the parties' intent as contractually expressed, and an unambiguous contract will be enforced as written." *Interstate Contracting Corp. v. City of Dallas, Tex.*, 407 F.3d 708, 712 (5th Cir. 2005) (citing *Leasehold Expense Recovery, Inc. v. Mothers Work, Inc.*, 331 F.3d 452, 456 (5th Cir. 2003).  All claims Plaintiff asserts in this lawsuit rest on a determination of "extra work or disputed work performed in connection with the Contract."  As such, LMD is required, as it agreed, to comply with the dispute resolution procedures mandated by Article 29 of the Program Contract, incorporated through Section 20 of the PCAs.  Again, LMD and SLS have engaged in that dispute process with the City. *See* SAC at Ex. B; SAC at Ex. C.

Plaintiff has pled no plausible theory of recovery of damages around this contractual obligation. Accordingly, Plaintiff's case should be dismissed in favor of the ongoing dispute resolution process.

## VI. <u>CONCLUSION</u>

70.     Plaintiff has failed to sufficiently plead its claims against Defendants. Based on the foregoing, Plaintiff's claims against Defendants must be dismissed.

Respectfully submitted,

**GREER, HERZ & ADAMS, L.L.P.**

By: /s/ *Joseph R. Russo, Jr.*
    Joseph R. Russo, Jr.
    Attorney-in-Charge
    Fed. ID No. 22559
    State Bar No. 24002879
    jrusso@greerherz.com
    Chelsi Honeycutt
    Fed. ID No. 3311304
    State Bar No. 24073478
    choneycutt@greerherz.com
    Jordan Raschke Elton
    Fed. ID No. 3712672
    State Bar No. 24108764
    jraschkeelton@greerherz.com
    One Moody Plaza, 18th Floor
    Galveston, Texas 77551
    (409) 797-3200 (Telephone)

**ATTORNEYS FOR
DEFENDANTS**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 30th day of April, 2024, a copy of this document was served on the below counsel via the court's ECF system:

Joshua W. Mermis
Stephen A. Dwyer
West Mermis, PLLC
1301 McKinney, Suite 3120
Houston, Texas 77010
jmermis@westmermis.com
sdwyer@westmermis.com

*/s/ Joseph R. Russo, Jr.*
Joseph R. Russo, Jr.

**CERTIFICATE OF CONFERENCE**

In accordance with Galveston Division Rule of Practice 6, Defendants conferred with opposing counsel on the merits of their Motion to Dismiss by letter on March 19, 2024.

*/s/ Joseph R. Russo, Jr.*
Joseph R. Russo, Jr.